

Judge Hollerstein

36-07/GMV/PLS

FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiffs
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Gina M. Venezia (GV 1551)
Pamela L. Schultz (PS 0335)

MAY 09 2007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
EUROTANKERS INC. and DYNASTIC
MARITIME INCORPORATED,

                                        Plaintiffs,                 **07 CV**

        -against –                                        **VERIFIED COMPLAINT**

AL-DAWOOD SHIPPING LINES LTD.,
                                        Defendant.

------------------------------------------------------x

        Plaintiffs EUROTANKERS INC. and DYNASTIC MARITIME INCORPORATED
(hereinafter collectively "Plaintiffs"), by their attorneys Freehill, Hogan & Mahar, LLP, as and
for their Verified Complaint against the named Defendant AL-DAWOOD SHIPPING LINES
LTD. (hereinafter referred to as "AL-DAWOOD") allege upon information and belief as
follows:

        1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the
Federal Rules of Civil Procedure in that it involves claims for breach of a maritime contract of
charter party. This case also falls under this Court's admiralty and maritime jurisdiction
pursuant to 28 U.S.C. §1333.

2.    At all times relevant hereto, Plaintiff EUROTANKERS INC. was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 99, Akti Miaoulis Street, 18538 Piraeus, Greece.

3.    At all times relevant hereto, Plaintiff DYNASTIC MARITIME INCORPORATED was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 80 Broad St., Monrovia, Liberia.

4.    At all times relevant hereto, Defendant AL-DAWOOD SHIPPING LINES LTD. (hereinafter "AL-DAWOOD") was and still is a foreign business duly organized and existing under the laws of a foreign country with an address at 41/43 Bombay Crescent, Apapa, Lagos, Nigeria.

5.    On or about October 25, 2006, Plaintiffs entered into a maritime contract with Defendant AL-DAWOOD for the chartering of the M/T NAPA for a period of one year commencing in November 2006.  A true and correct copy of the charter party is attached as **Exhibit A**.

6.    Under the charter party, AL-DAWOOD was to pay for the use and the hire of the vessel at a rate of $15,000 per day payable monthly and in advance.

7.    The vessel was duly delivered and tendered into service under the charter, and hire was earned.

8.    On December 4, 2006, Plaintiffs sent an invoice to AL-DAWOOD for hire due and owing and bunker expenses.  Despite due demand, AL-DAWOOD failed to pay amounts due and owing to Plaintiffs under the charter party, including hire and bunker expenses.

9.   On December 8, 2006, Plaintiffs placed AL-DAWOOD on notice of its intent to withdraw the vessel if payment of hire was not forthcoming within seven days. A copy of this notice is attached as **Exhibit B.**

10. On December 14, 2006, Plaintiffs provided 24-hour notice of withdrawal of the vessel as per the charter party.

11. AL-DAWOOD failed to pay the amounts due and outstanding under the charter, and on December 15, 2006, exercising their rights under the charter party, Plaintiffs withdrew the vessel. A copy of the withdrawal notice is attached as **Exhibit C.**

12. Plaintiffs have fulfilled all obligations required of them under the charter party.

13. Hire and bunker expenses remain due and owing by AL-DAWOOD for the period through December 15, 2006, in the amount of US $135,436.00.

14. AL-DAWOOD is also responsible for hire/lost earnings and bunker expenses for its breach of the charter in an additional amount of US $217,665.00, and for further losses due to its breach of the year-long charter party of US $1,730,000.00.

15. The charter party provides that it is to be governed by English law and disputes between the parties are to be submitted to the High Court in London, which rights are specifically reserved. Proceedings have been commenced against AL-DAWOOD in London.

16. Pursuant to English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are also recoverable as items of claim.

17. This action is brought to obtain jurisdiction over AL-DAWOOD and to obtain security in favor of Plaintiffs in respect to their claims against AL-DAWOOD under the charter.

18. This action is further brought to obtain security for any additional sums to cover Plaintiffs' accrued attorney fees and costs in pursuit of their claims against AL-DAWOOD, of US $15,000.00 and Plaintiffs' estimated attorney fees and costs estimated to be USD $150,000.00 (based on fees and costs incurred to date).

19. This action is further brought to obtain security for any additional sums to cover interest at a rate of 6% until the entry of judgment or an arbitration award in 2 years estimated to be USD $249,972.12.

20. Plaintiffs estimate, as nearly as can be computed, the total amount of their claim which is sought to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims by Plaintiffs against Defendant in the sum of $2,498,073.12.

### Relief Pursuant to Rule B

21. Upon information and belief, and after investigation, the Defendant identified in this action cannot be "found" within this district for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiffs are informed that Defendant has, or will shortly have, assets within this District comprising of, *inter alia*, cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (hereinafter, "ASSETS"), including but not limited to ASSETS in its name, at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

WHEREFORE, Plaintiffs pray:

a.    That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged, failing which a default will be taken against it;

b.    That since Defendant cannot be found within this District pursuant to Supplemental Rule B, that all assets of Defendant up to and including the sum of $2,498,073.12 may be restrained and attached, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of Defendant including but not limited to such assets as may be held, received or transferred in its own name or as may be held, received or transferred for its benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein; and

c.    That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and,

d.    For such other, further and different relief as this Court may deem just and proper

in the premises.

Dated: New York, New York
       May 8 , 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiffs

By: _____
       Gina M. Venezia (GV 1551)
       Pamela Schultz (PS 0535)
       80 Pine Street
       New York, NY 10005
       (212) 425-1900
       (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York   )
                   ) ss.:
County of New York  )

GINA M. VENEZIA, being duly sworn, deposes and says as follows:

1.     I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiffs in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.     The sources of my information and the grounds for my belief are communications, information and documentation provided by our client.

3.     The reason this verification is made by an attorney and not by the Plaintiffs are because the Plaintiffs are foreign entities, none of whose officers are presently within this Judicial District.

_____
Gina M. Venezia

Sworn to before me this
9th day of May 2007

_____
Notary Public
MARTHA E. BROWN
Notary Public, State of New York
No. 01BH6067399
Qualified in Kings County
Certificate Filed in New York County
Commission Expires December 10, 2009

Codeword for this Charterparty
"BPTIME3"

*TIME CHARTERPARTY*

Date *London, 25ᵗʰ October, 2006*

PREAMBLE

1 It is this day agreed between, Messrs. Tifanco, as brokers only
2 of 13/15 Homefield Road, Middlesex, HA0 2NL, UK
3 Messrs. EUROTANKERS INC. of 99, Akti Miaoulis Street, 18538 Piraeus, Greece
4 being owners/disponent owners of the motor/steam-tank vessel (delete as applicable) called
5 MT "NAPA"
6 and Messrs. AL-DAWOOD SHIPPING LINES LTD,
7 of 41/43 Bombay Crescent, Apapa, Lagos Nigeria
8 as Charterers
9 that the service for which provision is herein made shall be subject to the terms and
10 conditions of this Charter which comprises this PREAMBLE, PART 1 and PART 2, together with the
11 OCIMF Vessel Particulars Questionnaire or Q88 current at the date hereof and the BPTIME3 Questionnaire
12 together referred to as the 'Questionnaire') as attached hereto.
13 *Unless the context otherwise requires, words denoting the singular include the plural and vice versa*

14 In the event of any conflict between the provisions of PART 1 and PART 2 of this Charter, the provisions of

15 PART 1 shall prevail.

16 In the event of any conflict *between the provisions of PART 1 or PART 2 of this Charter and any provisions*
17 *in the Questionnaire, the provisions of PART 1 or PART 2 of this Charter shall prevail.*

*Capt. Elias Gotsis*
*3ᵗ O.O.A. O.C.*

*Samuji capt*
*27 Oct 06*

This document is a computer generated BPTIME3 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

EXHIBIT

A

18  A.  **Name of Vessel: MT "NAPA**

19  B.  **Charter Period:**                                                    November 2006 till
                                                                                November 2007

20       Charterers are permitted to exercise their option to purchase the tanker within three
         months or at anytime but not exceeding the ninth month of the Time Charter as per
         governing  NSF 93 MOA dated on or around 30ᵗʰ January 2007.

21

22

23

24  C.  **Laydays/Canceling:**

25       Commencing 0001 hours local time on                         ,         15 November 2006

26       Canceling: 1600 hours local time on                                   30 November 2006
27

28

29

30  D.  **Place of Delivery:**                                                 Drop Outward Last Pilot
                                                                                Tuzla, Gulf of Izmit, Turkey.

31

32

33

34

35

36  E.  **Vessel shall be delivered with the following cargo history:**       Clean tanks

37

38

39

40  F.  **Place of Redelivery:**                                              Drop Outward Last Pilot
                                                                                *Lagos anchorage, Nigeria.*

41

42

43  G.  **Bunkers on Delivery and Redelivery:**                              IFO 180:  120mt
                                                                                MGO:       80mt
44

45

3

This document is a computer generated BPTIM63 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of the document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

47  H.  **Rate of Hire:**                                                      USD15,000.00pdpr

48      United States Dollars Fifteen thousand only per day pro rata.

49      Including broker's commission of USD187.50pdpr for the account of Owners payable
        monthly to Tifanco. (USD one hundred and eighty seven dollars and fifty cents)

50

51  I.  **Owners' Payment Details:**

52      **National Bank of Greece**
        *Branch 196*
        *2, Bouboulinas Street, Akti Miaouli*
        *Piraeus 185 35*
        *Greece*
        *SWIFT: ETHNGRAA*
        *Via NY correspondence: Bank of New York swift: IRVTUS3N*
        *Or*
        *JP Morgan Chase swift::CHASUS33*
        *Beneficiary: EUROTANKERS INC.*
        *Account number 196-931882-86*

53

54
55

56

57

58

59  J.  **Bunker Specifications:**                                             IFO 180 cSt.

60

61

62

63

64

65  K.                                                                         Clean Petroleum
                                                                               Products
        **Permitted Cargoes:**                                                 Dirty Petroleum
66                                                                             Products

67

68

69

70

71

72  L.  **Trading Limits:**

This document is a computer generated BPTIME3 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document

| 72 | | always within safe port, safe berth, safe anchorages | Worldwide |
| 73 | | Except the following countries | Albania and Northern Cyprus |
| 75 | | | Democratic Peoples Republic of Korea USA and Puerto Rico |
| 76 | | | Israel |
| 77 | | | |
| 78 | M | **Additional Clauses:** | |
| 79 | | | |
| 80 | | | |

This document is a computer generated BPTIME3 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document

# PART 2

## COMMERCIAL PROVISIONS

### 1.    DELIVERY AND CHARTER PERIOD

1.1    Owners agree to let and Charterers agree to hire the Vessel from the time of delivery for a Charter Period as set out in PART 1, Section E. The Vessel shall be placed at the disposal of Charterers at the Place of Delivery as set out in PART 1, Section D. The Vessel shall not be delivered to Charterers prior to the Commencement Date.

1.2    Upon delivery the Vessel shall be tight, staunch, strong, in every way fitted for service, with cargo spaces, facilities and equipment ready to receive, carry and deliver cargo, and with a full complement of Master, officers and crew fully competent, certified and experienced to perform the services contracted for, and in all material respects meeting the description of the Vessel set out in the Questionnaire. Without prejudice to the aforesaid, upon delivery Owners, Master, officers, crew and all documents shall conform in all parts and in all material respects with the responses submitted in the Questionnaire.

### 2.    CANCELLATION

2.1    If the Vessel is not ready in accordance with Clause 1 and at Charterers' disposal by the Canceling Date (which term shall for the purposes of this Clause include any new Canceling Date determined under this Clause 2) Charterers shall have the option of canceling this Charter within forty-eight (48) hours after the Canceling Date.

2.2    Owners undertake to notify Charterers promptly if at any time Owners or the Master have reason to believe that the Vessel may not be delivered in accordance with Clause 1, by Canceling Date. Such notification is to be in writing and shall state the date and time that Owners expect the Vessel to be ready to be delivered.

2.3    If at any time it appears to Charterers that the Vessel will not be delivered in accordance with Clause 1 by the Canceling Date, Charterers may require Owners to state in writing the date and time that they expect the Vessel to be ready to be delivered, such statement is to be given within ninety-six (96) hours of Charterers' request.

2.4    If the date and time notified by Owners pursuant to sub-clauses 2.2, 2.3 or 4.1 falls after the Canceling Date then Charterers shall have the option of canceling this Charter within one hundred and twenty (120) hours of receipt of the said notice from Owners or within forty-eight (48) hours after the Canceling Date, whichever is earlier.
If Charterers do not exercise their option to cancel this Charter then the new Canceling Date for the purpose of this Clause 2 shall be twelve (12) hours after the date and time notified by Owners pursuant to sub-clauses 2.2 or 2.3, or such other date and time as may be mutually agreed.

2.5    If Owners fail, or fail timely, to respond in writing to Charterers when required to do so under sub-clause 2.3, Charterers shall have the option of canceling this Charter within one hundred and twenty (120) hours after the period allowed for Owners' response under sub-clause 2.3, or within forty-eight (48) hours after the Canceling Date, whichever is earlier.

### 3.    REDELIVERY

3.1    The Vessel shall be redelivered to Owners at the Place of Redelivery stipulated in PART 1, Section F on the expiry of the Charter Period, on completion of its final voyage on dropping last outward bound pilot, or as may otherwise be agreed.

3.2    Notwithstanding the provisions of sub-clauses 1.1 and 3.1 hereof, should the Vessel at the expiry of the Charter Period be on a ballast voyage to the Place of Redelivery or on a laden voyage (which for the purposes of this Clause shall be deemed to have commenced at the end of the sea passage to the first loadport), then Charterers shall have the use of the Vessel at the same rate and conditions for such extended time as may be necessary for the completion of the voyage on which

This is a computer generated NYPE93 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

it is engaged and, where required, its ballast voyage to the Place of Redelivery.

**4.    NOTICES OF DELIVERY AND REDELIVERY**

4.1    The below notices shall be given by Owners to Charterers in the case of delivery, and by Charterers to Owners in the case of redelivery: -

4.1.1    One calendar month prior to delivery / redelivery, notice shall be given specifying the anticipated date for delivery / redelivery.

4.1.2    Fifteen days prior to delivery / redelivery, notice shall be given specifying the firm date and estimated time of delivery / redelivery.

4.1.3    Thereafter seven, three, two and one day(s) prior to delivery / redelivery, notice shall be given reconfirming or advising of any adjustment to the date and time given in accordance with sub-clause 4.12. In addition, during the last fourteen days prior to delivery / redelivery, prompt notice shall be given of any variation of more than six (6) hours in the estimated time of delivery / redelivery.

4.2    If the Charter grants Owners or Charterers an option for the Place of Delivery or Redelivery, notice of the anticipated Place of Delivery / Redelivery shall be given one calendar month before delivery / redelivery, and firm nomination of the Place of Delivery / Redelivery shall be given fifteen days before delivery / redelivery.

**5.    BUNKERS ON DELIVERY AND REDELIVERY**

5.1    The Vessel shall be delivered with about the quantity of fuels stated in PART 1, Section G and shall be delivered with about the same quantity

5.2    Charterers shall accept and pay for all fuels on board at the time of delivery and Owners shall accept and pay for all fuels on board at redelivery (whether at the end of the Charter Period or upon termination of the Charter for other reasons), all at the price paid (net of all discounts and rebates) as substantiated by such documents as may reasonably be required. Charterers' payment for fuels on board at the time of delivery shall be made together with the first payment of hire. Charterers shall be entitled to deduct from the last payment of hire the value of fuels anticipated to be on board at redelivery.

**6.    CARGOES**

6.1    Charterers shall have the right to ship all lawful cargoes falling within the description set out in PART 1, Section E.

6.2    Charterers shall not ship, nor permit to be shipped, any cargo dangerous to the Vessel.

**7.    TRADING LIMITS**

The Vessel shall be employed in lawful trades within Institute Warranty Limits and within the Trading limits set out in PART 1, Section L.

**8.    HIRE**

8.1    Charterers shall pay hire per day or pro rata for part of a day from the time the Vessel is delivered to Charterers until its redelivery to Owners in the currency and at the rate stated in PART 1, Section H. All calculation of hire shall be by reference to Universal Time Co-ordinated (UTC) GMT.

8.2    The first payment of hire shall be received as cleared funds by buyers one banking day before made on or about the date of delivery, paying the hire in advance up to, but not including, the first day of the succeeding month. All subsequent payments of hire shall be made monthly in advance on the first day of each calendar month to the account stipulated in PART 1, Section I in funds available to Owners on the due date. If, however, in a given month the due date is a non-banking day in the United States (if hire is to be paid in US Dollars) or in the country stated in PART 1, Section I, then the subject month's hire shall be paid on the next banking day. Hire is payable on Commercial Invoice.

8.3    Hire for the month in which the anticipated date for redelivery under terms of MOA falls shall be made up to and including the anticipated date of redelivery. Any necessary adjustments shall be made by payment

© This edition is a computer generated BPTIME3 form issued by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of the document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document

by Owners to Charterers or by Charterers to Owners, as the case may be, ~~within twenty-eight (28)~~ ~~days after redelivery~~ at Closing Meeting.

8.4 Where there is a failure to pay hire by the due date, Owners shall notify Charterers in writing of such failure. Within five (5) banking days of receipt of such notification Charterers shall pay the amount due, failing which Owners shall have the right to suspend the performance of any or all of their obligations under this Charter and/or to withdraw the Vessel. If Owners elect to suspend performance of the Charter in respect of a particular late payment, they may still, notwithstanding that suspension of performance, withdraw the Vessel from the Charter in respect of that late payment provided they give a further twenty-four (24) hours' notice in writing of their intention to withdraw. Under no circumstances shall the act of suspending performance be construed as a waiver by Owners of the right to withdraw in respect of the continuing failure to pay hire or any subsequent late payment of hire under this Charter. Throughout any period of suspended performances under this Clause, the Vessel is to be and shall remain on hire. Charterers undertake to indemnify Owners in respect of any liabilities incurred by Owners under the bill of lading or any other contract of carriage as a consequence of Owners' proper suspension of and/or withdrawal from any or all of their obligations under this Charter.

8.5 On production of supporting vouchers, Charterers shall be entitled to deduct from hire any expenditure incurred on behalf of Owners which is for Owners' account under this Charter as well as any other costs and expenses due to Charterers which this Charter entitles them to deduct from hire. Charterers shall be entitled to a commission of 2.5% on expenditure settled on behalf of Owners.

8.6 Charterers may, at any time during the three months prior to the end of the Charter Period set out in PART 1, Section E, deduct from hire any amount which they reasonably estimate will be due to them at the end of the Charter Period in respect of expenditure on behalf of Owners

## OWNER'S RIGHTS AND OBLIGATIONS

9.    OWNERS' OBLIGATIONS

9.1 Without prejudice to Clause 1 Owners shall exercise due diligence to maintain the Vessel in, or restore the Vessel to, the condition required pursuant to Clause 1 throughout the Charter Period.

9.2 Owners undertake that from the date of entering into this Charter the classification society, flag, ownership, management (whether technical or commercial) and P&I Insurers of the Vessel shall not change without Charterers' prior consent. Without prejudice to any other right that Charterers may have, a breach of this provision will entitle Charterers to terminate this Charter, whereupon Owners shall reimburse Charterers with any hire paid in advance and not earned. Should Charterers withhold consent under this Clause, then Owners may require Charterers to promptly identify to them an alternative acceptable to Charterers.

9.3 Owners undertake that from the date of entering into this Charter the amount of Hull and Machinery insurance on the Vessel shall not change without Charterers' prior consent, which shall not be unreasonably withheld.

9.4 Without prejudice to Clause 1 and provided always that Owners are granted a reasonable time to perform cleaning, Owners shall throughout the Charter Period ensure that the Vessel presents for loading with its tanks, pumps and pipelines properly prepared to the satisfaction of any inspector appointed by or on behalf of Charterers and ready for loading the cargo specified by Charterers.

9.5 Owners shall remain responsible for the navigation of the Vessel, acts of pilots, tug boats and crew, same as when trading for their own account. Owners undertake that throughout the period of this Charter they will, at their own expense, comply with the regulations in force from time to time so as to enable the Vessel to pass through the Suez and Panama Canals by day and by night without delay.

9.6 Without limitation to the foregoing, Owners shall provide and pay for-
    9.6.1 provisions, wages (including overtime), discharging fees and all other expenses related to

This document was composed and generated (OPTIMO) from printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



the Master, officers and crew; and

9.6.2 cabin, deck, engine-room and other necessary stores, including domestic water; and

9.6.3 radio traffic and other communication expenses; and

9.6.4 insurance on the Vessel fully covering P&I risks and (without prejudice to Charterers' rights to freely trade the Vessel) standard oil pollution cover up to the level customarily offered by the International Group of P & I Clubs (currently US$1,000 million), Hull and Machinery and basic War Risks in accordance with the information set out in the Questionnaire; and

9.6.5 all documentation required to permit the Vessel to trade within the Trading Limits set out in PART I, Section L, including but not limited to the certificates and documentation confirmed by Owners in the Questionnaire to be in place and such documentation shall be maintained in force during the currency of the Charter.

10. MASTER AND CREW

10.1 The Master, although appointed by Owners, shall throughout the Charter Period be under the orders and directions of Charterers as regards employment, agency or other arrangements and shall render Charterers all reasonable assistance with the officers, crew and equipment (including but not limited to connecting and disconnecting hoses for loading and discharging, verifying fuel samples and the procedure associated with the delivery of fuel) and supply Charterers with such information and documentation as they may from time to time require (including but not limited to logs, time sheets, safety performance information and certification relating to officers, crew or Vessel).

10.2 The Master shall, throughout the Charter Period, operate the Vessel and carry out his duties in a manner consistent with good seamanship, complying with the recommendations set out in the latest edition of ISGOTT and maintaining the safety of the vessel, its crew, the cargo and the environment, and shall prosecute all voyages with due dispatch.

10.3 The Master shall observe regulations and recommendations as to traffic separation and routing as issued, from time to time, by responsible organizations or regulatory authorities, or as promulgated by the State of the flag of the Vessel or the State in which management of the Vessel is exercised.

10.4 If Charterers are dissatisfied with the conduct of the Master or any officer or crew member, Owners shall on receiving particulars of the complaint, promptly investigate the same, and, if necessary make a change in the appointment.

11. BILLS OF LADING AND WAYBILLS

11.1 Bills of lading and waybills shall be signed as Charterers direct, without prejudice to this Charter. Charterers hereby indemnify Owners:-

11.1.1 against all liabilities that may arise from the signing of bills of lading and waybills in accordance with the directions of Charterers to the extent that the terms of such bills of lading and waybills impose more onerous liabilities than those assumed by Owners under the terms of this Charter; and

11.1.2 against claims brought by holders of bills of lading and waybills against Owners by reason of any deviation ordered by Charterers.

11.2 All bills of lading and waybills issued under this Charter shall include a Clause Paramount and War Risks, New Jason, General Average, and Both-to-Blame Collision clauses, in the form set out in this Charter.

12. DRUGS AND ALCOHOL POLICY

12.1 Owners undertake that they have, and shall maintain for the duration of this Charter, a policy on Drugs and Alcohol Abuse applicable to the Vessel (the "D & A Policy") that meets or exceeds the standards in the OCIMF Guidelines for the Control of Drugs and Alcohol Onboard Ship 1995 as

9

This document is a computer generated BPTME3 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

amended from time to time.

12.2 Owners shall exercise due diligence to ensure that the D & A Policy is understood and complied with on and about the Vessel. ~~An actual impairment, or any test finding of impairment, shall not in and of itself mean that Owners have failed to exercise due diligence.~~

## 13. DRY-DOCKING

Without prejudice to Clause 19, Owners shall have the right at their expense to take the Vessel out of service, including placing the Vessel in dry-dock. For emergency repairs this right may be exercised in accordance with Owners' discretion. For routine maintenance and surveys, the right may only be exercised at a time and place mutually agreed upon by Owners and Charterers.

## 14. LIEN

Owners shall have a lien upon all cargoes, hire, sub-hire, freights and sub-freights for any amounts owed by Charterers under this Charter.

## CHARTERERS' RIGHTS AND OBLIGATIONS

## 15 CHARTERERS' OBLIGATIONS

15.1 Charterers shall furnish the Master with full and timely instructions.

15.2 Charterers shall provide and/or pay for:-

15.2.1 all fuels of a quality suitable for burning in the Vessel's engines and auxiliaries (which shall comply with the description in PART 1, Section L) except for quantities of fuel consumed while the Vessel is off-hire which shall be for Owners' account; and

15.2.2 port charges, light and canal dues, and all other charges or expenses relating to loading and discharging; and

15.2.3 agency fees for normal ship's husbandry at all places or ports of call; and

15.2.4 towage, pilotage and all mooring, loading and discharging facilities and services, provided always that Charterers shall bear no liability for the negligence or misconduct exercised by the providers of such services and facilities.

15.3 Any additional premiums charged by the providers of oil pollution cover by reason of loading or discharging at ports in the USA and USA-controlled territories shall be for Charterers' account and shall be reimbursed to Owners together with the installment of hire next falling due following presentation to Charterers of proper receipts evidencing payment.

15.4 Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might have priority over the title and interest of Owners.

## 16. SPACE AVAILABLE TO CHARTERERS

16.1 The whole reach, burthen and decks of the Vessel, and its passenger accommodation (including Owners' suite if any), shall be at Charterers' disposal, reserving only proper and sufficient space for the Vessel's Master, officers, crew, tackle, apparel, furniture, provisions, stores and lubricating oil.

16.2 The weight of stores and lubricating oil stored on board shall not at any time during the Charter Period, unless specifically agreed, exceed the tonnage shown in the Questionnaire.

## 17. LOADING AND DISCHARGE / SHIP-TO-SHIP TRANSFERS

17.1 The Vessel shall be loaded and discharged at any port (which term for the purpose of this Charter shall include any port, berth, dock, loading or discharging anchorage or offshore location, submarine line, single point or single buoy mooring facility, alongside vessels or lighters or any other place whatsoever as the context requires) in accordance with Charterers' instructions. Before instructing Owners to direct the Vessel to any port, Charterers shall exercise due diligence

10

This document is a computer generated SHIPMEN form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

to ascertain the safety of such port, but Charterers do not warrant the safety of any port and shall be under no liability in respect thereof except for loss or damage caused by Charterers' failure to exercise due diligence.

17.2 Charterers shall have the option of transferring the whole or part of the cargo (which shall include topping-off and lightening) to or from any other vessel including, but not limited to, an ocean-going vessel, barge and/or lighter (the "Transfer Vessel").

All transfers of cargo to or from Transfer Vessels shall be carried out in accordance with the recommendations set out in the latest edition of the "ICS/OCIMF Ship to Ship Transfer Guide (Petroleum)". Owners undertake that the Vessel and its crew shall comply with such recommendations, and similarly Charterers undertake that the Transfer Vessel and its crew shall comply with such recommendations. Charterers shall provide and pay for all necessary equipment including suitable fenders and cargo hoses. Charterers shall have the right, at their expense, to appoint supervisory personnel to attend on board the Vessel, including a mooring master, to assist in such transfers of cargo.

18.    PERFORMANCE OF VESSEL - SPEED AND CONSUMPTION

18.1 Unless otherwise ordered by Charterers, the Vessel shall perform all voyages at the service speed stated in the Questionnaire.

18.2 Owners warrant that the Vessel is and shall remain capable of maintaining, throughout the Charter Period, the speeds and bunker consumptions for propulsion described in the Questionnaire under normal working conditions and in moderate weather (which for the purpose of this Clause shall exclude any periods of winds exceeding Force 5 on the Beaufort Scale). Charterers shall have the right to make deductions from hire in time lost and any additional bunkers consumed by reason of the Vessel's failure to maintain the warranted capability.

19.    OFF-HIRE

19.1 The Vessel shall be off-hire on each and every occasion that there is a loss of time arising out of or in connection with the Vessel being unable to comply with Charterers' instructions (whether by way of interruption or reduction in the Vessel's services, or in any other manner) on account of:-

19.1.1 any damage, defect, breakdown, deficiency of or accident to the Vessel's hull, machinery, equipment or cargo handling facilities, or maintenance thereto; or

19.1.2 any default and/or deficiency of the Master, officers or crew, including the failure or refusal or inability of the Master, officers and/or crew to perform the services required; or

19.1.3 any breach of sub-clause 26.5; or

19.1.4 any other cause preventing the full working of the Vessel.

Notwithstanding the aforesaid, if the total loss of time pursuant to this sub-clause 19.1 is less than three hours in any one calendar month, the Vessel shall not be off-hire.

19.2 If the Vessel deviates, unless ordered to do so by Charterers, it shall be off-hire from the commencement of such deviation until the Vessel is again ready to resume its service from a position not less favourable to Charterers than that at which the deviation commenced. For the purposes of this Clause the term deviation shall include stopping, reducing speed, putting back or putting into any port or place other than that to which it is bound under the instructions of Charterers for any reason whatsoever, including for maintenance, dry-docking, taking on stores or fresh water, but shall exclude deviations made to save life or property. Should the Vessel deviate to avoid bad weather or be driven into port or anchorage by stress of weather, the Vessel shall remain on hire and all port costs thereby incurred and bunkers consumed shall be for Charterers' account. Any service given or distance made good by the Vessel while off-hire shall be taken into account in assessing the amount to be deducted from hire.

19.3 Any time during which the Vessel is off-hire under this Charter may be added, at Charterers'

11

This document is a computer generated BPTIME3 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document, which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

366  option, to the Charter Period. Such option shall be declared in writing not less than one month
367  before the expected date of Closing Meeting redelivery, or promptly if such event occurs less than one
     month
368  before the expiry of the Charter Period. If Charterers exercise their option to extend the Charter
369  Period pursuant to this Clause, the Charter Period shall be deemed to include such extension and
370  hire shall be payable at the rate(s) which would have been payable but for the relevant off-hire
371  event.

372  **20.    LAYING UP**

373  Charterers shall have the option to lay up the Vessel at a place nominated by them and acceptable to
374  Owners. Charterers shall exercise due diligence to ascertain the safety of such place but shall be under no
375  liability in respect thereof except for loss or damage caused by Charterers' failure to exercise due diligence.
376  If Charterers exercise the option to lay up the Vessel then the hire stipulated in PART I, Section II shall be
377  adjusted to reflect any net increase in expenditure reasonably incurred (including but not limited to costs
378  reasonably incurred in preparing the Vessel for lay up as well as restoring it to the condition in which it was
379  immediately prior to laying up) or net saving which should reasonably be made by Owners as a result of
380  such lay up.

381  **21.    STORAGE**

382  Charterers shall have the option of using the Vessel for floating storage but Charterers undertake not to use
383  the Vessel for floating storage in areas where additional premiums for War Risks Insurance are charged by
384  the Vessel's War Risks Insurance underwriters.

385  **22.    SUB-LET**

386  Charterers may sub-let the Vessel without prejudice to the respective rights and obligations of either party
387  under this Charter.

388  **23.    SUPERNUMERARIES**
389  Charterers may send supernumeraries in the Vessel's available accommodation upon any voyage made
390  under this Charter. In such event Owners shall provide provisions and all requisites, as supplied to
391  officers, except alcohol.

392  **24.    VESSEL/CARGO INSPECTIONS/BUNKER SURVEYS**

393  Charterers shall be entitled to cause their representative (which term includes any independent surveyor
394  appointed by Charterers) to carry out inspections of the Vessel and/or observe cargo operations and/or
395  ascertain the quantity and quality of the cargo, water and residues on board, including the taking of cargo
396  samples, inspection and copying of the Vessel's logs, documents and records (which shall include but not
397  be limited to the personal notes of the Master, officers or crew relating to the operation of the Vessel, the
398  rough log book and computer generated data) at any loading and/or discharge port. Charterers'
399  representative may also conduct any of the aforementioned operations at or off any other port to which
400  Charterers may require the Master to divert the Vessel at any time after leaving any loading port.
401  Charterers shall obtain the consent of the owners of any cargo on board at the time before requiring the
402  Vessel to be diverted.

403  Charterers' representative shall be entitled to survey, and take samples from, any or all of the Vessel's cargo
404  tanks, bunker fuel tanks and non-cargo spaces at any place referred to above.

405  **SPECIAL PROVISIONS**

406  **25.    CLAUSE PARAMOUNT**

407  Charterers undertake that all bills of lading and waybills issued under this Charter shall contain the
408  following:

409  "CLAUSE PARAMOUNT

410  (1)    This Bill of Lading shall have effect subject to any national law making the International Convention
411          for the unification of certain rules of law relating to bills of lading signed at Brussels on 25th August
412          1924 (The Hague Rules) or the Hague Rules as amended by the Protocol signed at Brussels on 23rd

12

This document is a computer generated BPTIME3 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of any reliance or loss between the original BIMCO approved document and this computer generated document.

February 1968 (The Hague/Visby Rules) compulsorily applicable to this Bill of Lading. If any term of this Bill of Lading be repugnant to that legislation to any extent, such term shall be void to that extent but no further. Neither the Hague Rules nor The Hague/Visby Rules shall apply to this Bill of Lading where the goods carried hereunder consist of live animals or cargo which by this Bill of Lading is stated as being carried on deck and is so carried.

(2)   Save where the Hague or Hague/Visby Rules apply by reason of (1) above, this Bill of Lading shall take effect subject to any national law in force at the port of shipment or place of issue of the Bill of Lading making the United Nations Convention on the Carriage of Goods by Sea 1978 (the Hamburg Rules) compulsorily applicable to this Bill of Lading in which case this Bill of Lading shall have effect subject to the Hamburg Rules which shall nullify any stipulation derogating there from to the detriment of the shipper or consignee.

(3)   Where The Hague, Hague/Visby or Hamburg Rules are not compulsorily applicable to this Bill of Lading, the carrier shall be entitled to the benefits of all privileges, rights and immunities contained in Articles I to VIII of the Hague/Visby Rules.

(4)   Nothing in this Bill of Lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law'.

26.   SALVAGE

The Master is authorised to render assistance to other vessels. All salvage and remuneration for such assistance shall be for Owners' and Charterers' equal benefit after deducting the Master's and Crew's Proportion and all costs, expenses and sacrifices (including but not limited to loss of time, off-hire, hire paid, repairs to the Vessel and bunker fuel consumed). Any non-contractual liability to third parties shall be for Owners' account unless it solely affects the salvage remuneration.

27.   ICE

The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights, lightships, markers or buoys have been or are about to be withdrawn by reason of ice, nor where on account of ice there is, in the Master's sole discretion, a risk that, in the ordinary course of events, the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading or discharging. The Vessel shall not be obliged to force ice but, subject to Owners' prior approval, may follow ice-breakers when reasonably required, with due regard to its size, construction and class. If, on account of ice, the Master in his sole discretion considers it unsafe to proceed to, enter or remain at the place of loading or discharging for fear of the Vessel being frozen in and/or damaged, he shall be at liberty to sail to the nearest ice-free place and there await Charterers' instructions.

28.   REQUISITION

Should the Vessel be requisitioned by any government, de facto or de jure, during the period of this Charter, the Vessel shall be off-hire during the period of such requisition, and any hire paid by such government and costs incurred in respect of such requisition shall be for Owners' account. The option granted to Charterers in subclause 19.3 shall not apply to periods of off-hire pursuant to this Clause 28.

29.   OUTBREAK OF WAR

Either party may cancel this Charter on the outbreak of war or hostilities between any two or more of the following countries: the United States of America, the Russian Federation, the United Kingdom, France and the People's Republic of China.

30.   WAR RISKS

30.1 For the purpose of this Clause, the words:

30.1.1 'Owners' shall include the Shipowners, bareboat Charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

30.1.2 'War Risks' shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines

(whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or

13

This document is a computer generated BIMCO form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to this pre-printed document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgment of the Master and/or Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, its cargo, crew or other persons on board the Vessel.

30.2 The Vessel, unless the written consent of Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, its cargo, crew or other persons on board the Vessel, in the reasonable judgment of the Master and/or Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after its entry into it, the Vessel shall be at liberty to leave it.

30.3 The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where it shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

30.4 Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.
If the Underwriters of such insurance should require payment of premium and / or calls because, pursuant to Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by Charterers to Owners at the same time as the next payment of hire is due.

30.5 If Owners become liable under the terms of employment to pay the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to Owners by Charterers at the same time as the next payment of hire is due.

30.6 The Vessel shall have liberty:-

30.6.1 to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

30.6.2 to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

30.6.3 to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

30.6.4 to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

30.6.5 to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

This document is a computer generated BIMCO form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

30.7 If in accordance with their rights under the foregoing provisions of this Clause, Owners refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform Charterers.

### 31. GENERAL AVERAGE

General Average shall be adjusted and settled in London in accordance with the York-Antwerp Rules, 1994 or any subsequent modification thereof.

### 32. NEW JASON

If, notwithstanding Clause 31, General Average is adjusted in accordance with the law and practice of the USA, the following provision shall apply:-

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery".

### 33. BOTH-TO-BLAME COLLISION

If the liability for any collision in which the Vessel is involved while performing this Charter falls to be determined in accordance with the laws of the ~~USA~~ UK, or the laws of any State which applies laws similar to those applied in the ~~USA~~ UK in the circumstances envisaged by this Clause 33, the following provision shall apply:-

If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or in the management of the Vessel, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying vessel or its owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying vessel or its owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying vessel or its owners as part of their claim against the carrying vessel or carrier.

The foregoing provisions shall also apply where the owner, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of collision or contact "

Whilst Charterers shall procure that all bills of lading and waybills issued under this Charter shall contain a provision in the foregoing terms, to be applicable where the liability for any collision in which the Vessel is involved falls to be determined under the preamble of this Clause 33, Charterers neither warrant nor undertake that such provision shall be effective. In the event that such provision proves ineffective Charterers shall, notwithstanding anything to the contrary herein provided, not be obliged to indemnify Owners.

### 34. OIL POLLUTION PREVENTION

34.1 Owners undertake that the Vessel is a tanker owned by a member of the International Tanker Owners' Pollution Federation Limited and will so remain throughout the period of this Charter.

34.2 When an escape or discharge of Oil occurs from the Vessel and causes or threatens to cause Pollution Damage, or when there is the threat of an escape or discharge of Oil (i.e. a grave and imminent danger of the escape or discharge of Oil which, if it occurred, would create a serious danger of Pollution Damage, whether or not an escape or discharge in fact subsequently occurs), then upon notice to Owners or Master, Charterers shall have the right (but shall not be obliged) to

15

In the Charterer's computer generated BIMCO form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of ...... discrepancies between the original BIMCO approved document and this computer generated document.

place on board the Vessel and/or have in attendance at the incident one or more Charterers'
representatives to observe the measures being taken by Owners and/or national or local
authorities or their respective servants, agents or contractors to prevent or minimise Pollution
Damage and to provide advice, equipment or manpower or undertake such other measures, at
Charterers' risk and expense, as are permitted under applicable law and as Charterers believe are
reasonably necessary to prevent or minimise such Pollution Damage or to remove the threat of an
escape or discharge of Oil.

34.3 The provisions of this Clause 34 shall be without prejudice to any other rights and/or duties of
Charterers or Owners whether arising under this Charter or under applicable law or under any
International Convention.

34.4 In this Clause the terms 'Oil' and 'Pollution Damage' shall have the same meaning as that
defined in the Civil Liability Convention 1969 or any Protocol thereto.

35.    EXCEPTIONS

35.1 The provisions of Article III (other than Rule 8 thereof), IV, IV *bis*, VII and VIII of the Schedule
to the Carriage of Goods by Sea Act 1971 of the United Kingdom shall apply to this Charter and
shall be deemed to be inserted *in extenso* herein. This Charter shall be deemed to be a contract for
the carriage of goods by sea to which the said Articles apply and no regard shall be had to Article
I of the said Schedule. However, nothing in this Clause shall be deemed to modify, limit or
exclude the parties' rights and obligations as set out in Clauses 1, 9, 10, 11, 18 and 19 hereof.

35.2 Where a claim for indemnity is brought under this Charter, the defending party shall be entitled to
rely on all defenses and limitations, whether founded on contract, tort, legislation or convention,
that the claimant could have relied on in the principal action or in relation to the principal claim.

35.3 Notwithstanding the aforesaid:
    35.3.1 Where a claim for indemnity relating to a claim pursued by a third party is brought
    under this Charter, such claim shall be extinguished unless suit is commenced within
    twelve (12) months of the principal claim being settled by the parties thereto or
    determined by the final, unappeal-able judgment of a competent court,

    35.3.2 All other claims shall be subject to the statutory limitation period.

36.    LAW

The construction, validity and performance of this Charter shall be governed by English Law. The High
Court in London shall have exclusive jurisdiction over any dispute which may arise out of this Charter.

Notwithstanding the aforesaid, the parties may jointly elect to have any such dispute referred to arbitration
in London pursuant to the Arbitration Act 1996 or any modification or re-enactment thereof for the time
being in force and under the Terms of the London Maritime Arbitrators' Association before a tribunal
consisting of three arbitrators.

*In Witness Whereof the* parties have caused this Charter to be executed as of the date first above written

for and on behalf of

OWNERS
Capt Elias Gotsis

for and on behalf of

CHARTERERS
CAPT DO LABINJO

16

This document is a computer generated BIMCO form passed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

London, Tuesday, 28 November 2006

Addendum to BPTime3 dated 25th October 2006 between Eurotankers Inc as Owners and Al-Dawood Shipping Lines as Charterers.

It has been mutually agreed that the cancelling date shall be modified as follows

1    Part I C line 26 will be modified to 8th December 2006.

All other terms and conditions remain unchanged.


Signed



_____
Eurotankers Inc.

Capt Elias Cutum


_____
Al-Dawood Shipping Lines Ltd.    28 Nov 06

## Operation1

| | |
|---|---|
| **From:** | Igor Raspopov [iraspopov@palmali.gr] |
| **Sent:** | Σάββατο, 23 Δεκεμβρίου 2006 12:59 μμ |
| **To:** | shipping@litasco.ch; fueloil@litasco.ch; WALKER David; SELMI Reza; HANSSON Ola; HEENAN Brett; MONTEFIORI Marco; BRADLEY Sean |
| **Cc:** | Eurotankers; Operation |
| **Subject:** | NAPA / LITASCO / FO FROM BLSEA TO OPTIONS / CP DD 23.12.2006 / CLEANJ RECAP |

**Importance:** High

```
TO : LITASCO
AT : SHIPPING DEKS PLS
CC : FUELOIL DESK PLS
CC : MR D.WALKER PLS
CC : OPS DEPT PLS
TO : EUROTANKERS
AT : CAPT ELIAS GOTSIS PLS
CC : CAPT GEORGE SINANIS PLS
CC : PALMALI GR / OPS DPE TPLS
FM : PALMALI GR / CHARTERING
NAPA / LITASCO / FO FROM BLSEA TO OPTIONS /  CP DD 23.12.2006 /
CLEAN RECAP

GD
WE ARE PLEASED TO CONFIRM FOLLOWING AGREEMENT  WITH ALL SUBJ DULY
LIFTED
AS PER BELOW TERMS AND CONDITIONS

ACCOUNT : LITASCO
OWNERS : AS PER ATTACHED Q88
BROKER : MSSRS PALMALI GR / PIC MR IGOR V RASPOPOV / +30 210
4290413.4.5
CP DD :  23.12.2006
CPARTY : EXXONMOBVOY +LITASCO CHARTERING TERMS

SHIP'S NAME  :NAPA
FLAG         : PANAMA
CALL SIGN    :H9SD
IMO nbr      :7925041
LOA          :176,7 mtrs
BREADTH      :28,35 mtrs
DEPTH MOULDED:14,018 mtrs
GRT     .    :18,505
NRT     .    :9,666
Summer DEADWEIGHT: 29,972
Summer DRAFT : 10,060 mtrs
Vessel's INMS C : 00580 435549010 NAPA
Vessel's tel INMS B: 00870 335549010
Vessel's fax INMS B: 00870 335549011
```

Vessel's E-mail    : master.napa@telaurus.net
-Vessel converted to a DOUBLE / DOUBLE HULL tanker on Dec. 2006.
-Vessel has CAP   HULL MACHINERY and CARGO HANDLING SYSTEM GRADE 2
-Last three Cargoes: CRUDE / CRUDE / CRUDE
PRESENT POSTION AND ETA :
PRESENTLY AT ISTANBUL ROADS / WAITING ORDER
ETA BSS YUZHNIY WITH NO DELAY AT T/S 24.12.2006

FOR

----------- C A R G O -----------
CARGO QUANTITY : F/C MINIMUM 10000 MT WITH CHARTERERS OPTION
                UP TO FULL CARGO. NO DEADFREIGHT FOR CHARTERERS
                ACCOUNT PROVIDED MINIMUM QUANTITY
CARGO GRADE(S) : FUEL OIL AND/OR VGO
SEGREGATION    : 2 (TWO) GRADE(S) WITHIN VSL NATURAL SEGREGATION
HEAT           : VESSEL TO MAINTAIN LOADED TEMP BUT MAX 135 DEG F
                MAX LOADED TEMP 160 DEG F

----------- D A T E S -----------
LAYCAN      :24-26.12.20060001) - 12TH (2359 HRS) DEC, 2006
ITINERARY   :SEE ABOVE

----------- G E O G R A P H I C A L ----------
LOAD        : 1/2 SP BLACK SEA EXCL SEA OF AZOV BUT INCL STS KERCH. INTENTION
TO LOAD FROM YUZHNIY
DISCHARGE   : 1/2 ADRIATIC SEA (INTENTION BAR)
              OR CHOPT
              ISA STS AT KERCH TO MOTHER VESSEL PARWAY
              FINAL DISCHARGE PORT TO BE DECLARED BY CHRTRS LATEST VESSEL
ARRIVAL AT LOADING PORT.
              MAX USD27500LPS TO BE FOR OWNERS ACCOUNT AS D/A AT STS
INCLUDING
              AGENCY FEE,OVER AND ABOVE FOR CHRTRS ACCOUNT

----------- F I N A N C I A L ---------------
FREIGHT RATE :USD250,000.00LPS BSS ADRIATIC DISCHARGE
              USD150,000.00 LPS BSS STS KERCH DISCHARGE
DEMURRAGE    :USD17,000.00PDPR
LAYTIME      :72 HRS TTL SHINC
COMMISSION   :2.5 PCT TTL COMMISSION HERE IAC DEDUCTABLE AT SOURCE
              AND SPLIT AS FOLLOWS:
- 1.25 PCT ADDRESS COMM TO CHARTERERS ON FREIGHT AND DEMURRAGE
- 1.25 PCT BROKERS COMM TO FALMALI GREECE ON FRT/DFRT/DEMM PAYABLE BY OWNERS
WHEN INVOICED

        FREIGHT PAYMENT DETAILS
        -----------------------

OWNERS TO REVERT
VESSEL TO PERFORM LADEN PASSAGE AT 13 KNOTS WSNP

----------- T E R M S ------------
WHTI   -
-BIMCO ISPS CLSE
-BIMCO AMS CLSE

CANCELLATION CLSE :
(AMENDED TO READ 'IN WRITING' AND '48 HRS' AND IF
NOTIFICATION ON FRIDAY ...)

- - - - - - - - - - - - - - - - - - - - - - ---
IF IT BECOMES OBVIOUS TO THE OWNERS THAT THE VESSEL WILL NOT
MEET HER CANCELING DATE, OWNERS TO NOTIFY CHARTERERS OF VESSELS
ETA AND PROPOSED NEW CANCELING DATE. CHARTERERS HAVE THE OPTION
TO CANCEL THE CHARTER WITHIN 48HRS OF NOTICE OR EXTEND IN
ACCORDANCE WITH OWNERS NEW PROPOSED CANCELING DATE. IF CHARTERERS
DECIDE TO CANCEL THE CHARTER, IT SHALL BE WITHOUT ANY FURTHER
LIABILITIES TO EITHER PARTY. IF CHARTERERS DO NOT CANCEL THE
CHARTER WITHIN 48HRS AFTER RECEIPT OF OWNERS NOTICE, THE CHARTER
PARTY IS MAINTAINED ON BASIS OF THE NEW CANCELING DATE PROPOSED
BY THE OWNERS.IF OWNERS NOTIFICATION IS MADE ON FRIDAY, SO LONG
AS OWNERS INFORM CHARTERERS BY LATEST 1200 HRS LONDON TIME ON A
FRIDAY, THEN CHARTERERS TO HAVE UNTIL LATEST 1200 HRS LONDON ON
THE FOLLOWING MONDAY TO DECIDE.

ICE CLAUSE
VSL NEVER TO TRADE IN ANY KIND OF ICE INCLUDING SLUSH NOR TO FOLLOW
ICE BREAKER.

EXXONMOBIL VOY 2005 DTD 1ST SEP '05 AS FOLL:
-----------------------------------------------
PART I
(G) - INSERT '50PCT OF BASE FREIGHT RATE'
(L) - INSERT 'ADDITIONAL LITASCO CLAUSES 1-30 AS ATTACHED'
      SHALL BE DEEMED INCORPORATED IN THE CHARTER PARTY'
PART II
LINE 40 DEL 'CHARTERERS REPRESENTATIVE' INSERT 'INDEPENDENT, AND
      ACCEPTABLE FOR OWNERS, SURVEYOR'
LINE 125 AFTER '72 HRS' INSERT 'IF/WHEN APPLICABLE'
LINE 153-161 DEL.
      INSERT CANCELLATION CLS ASF:
      IF IT BECOMES OBVIOUS TO THE OWNERS THAT THE VESSEL WILL
      NOT MEET HER CANCELING DATE, OWNERS TO NOTIFY CHARTERERS
      OF VESSELS ETA AND PROPOSED NEW CANCELING DATE.
      CHARTERERS HAVE THE OPTION TO CANCEL THE CHARTER WITHIN
      24 HOURS OF NOTICE OR EXTEND IN ACCORDANCE WITH OWNERS
      NEW PROPOSED CANCELING DATE. IF CHARTERERS DECIDE TO
      CANCEL THE CHARTER, IT SHALL BE WITHOUT ANY FURTHER
      LIABILITIES TO EITHER PARTY. IF CHARTERERS DO NOT CANCEL
      THE CHARTER WITHIN 24 HOURS AFTER RECEIPT OF OWNERS
      NOTICE, THE CHARTER PARTY IS MAINTAINED ON BASIS OF THE
      NEW CANCELING DATE PROPOSED BY THE OWNERS.
CLAUSE 13.C. - LINE 173 'TWO(2) HOURS' INSERT 'THREE(3) HOURS'
      LINE 183 AFTER 'DELAYED' INSERT 'EXCEPT IN CASE OF
      STS/LIGHTERING OPERATIONS'
LINE 192 DELETE 'ICE'
LINE 202 AFTER ' ARRIVAL IN' INSERT 'FIRST'
LINE 251 DELETE 'DISCONNECTING OF THE CARGO HOSES
      FROM THE LAST CARGO RECEIVING VESSEL HAVE
      BEEN COMPLETED' INS 'WHEN THE LAST OFF
      TAKING VESSEL IS AWAY'
LINE 255 DELETE 'DISCONNECTING OF THE CARGO HOSES
      FROM THE LAST CARGO RECEIVING VESSEL HAVE
      BEEN COMPLETED' INS 'WHEN THE LAST OFF
      TAKING VESSEL IS AWAY'
LINE 260 INSERT AFTER 'PART I(D)' 'UNLESS SO

```
        DESIGNATED BY WS ASSOCIATION'
LINE 338 AFTER 'VESSEL' INSERT 'AT MASTERS
        DISCRETION IN LIGHT OF SAFETY'
LINE 342 DEL '(BE IT ONE OR MORE GRADES)'
LINE 343 DEL 'RAIL' INSERT 'MANIFOLD'
LINE 343 DEL 'A MINIMUM' INSERT 'AN AVERAGE'
LINE 343 ADD 'EXCLUDING STARTUP AND STRIPPING
        PERIODS (MAX 3 HOURS)'
LINE 353 DELETE 'RAIL' INSERT 'MANIFOLD'
LINE 360 INSERT 'PUMPABLE' PRIOR 'LIQUID'. AFTER
        'CARGO' INSERT 'WHICH IS PUMPABLE AND
        REACHABLE BY VESSEL'S FIXED PUMPS'.
        ADD AT END 'SHOULD OWNER ASSERT THAT
        CARGO REMAINING ON BOARD IS NOT PUMPABLE
        AND REACHABLE, OWNERS TO PROVIDE
        SATISFACTORY DOCUMENTARY EVIDENCE TO
        SUPPORT SAME'
CLAUSE 19 - DELETE N/A
LINE 379 ADD 'UNLESS OTHERWISE STATED IN WORLDSCALE'
CLAUSE 21 - DELETE (SEE ADDITIONAL LITASCO
CLS 20. ICE CLAUSE) CLAUSE 22 - DELETE N/A
CLAUSE 25 - OK WHEN APPLICABLE AND AGREED
CLAUSE 26 - DELETE N/A
CLAUSE 27 B.III.
LINE 454 DELETE 'NEW YORK' INSERT 'LONDON'
LINE 461 DELETE 'NEW YORK' INSERT 'LONDON'
CLAUSE 31 - DELETE, INS CHARTERERS AGENT BOTH ENDS PROVIDED IN LINE
WITH USSUAL TARRIFES
CLAUSE 35 - DELETE (SEE ADDITIONAL LITASCO CLS 26.ARBITRATION)
CLAUSE 36 - DELETE (SEE ADDITIONAL LITASCO CLS 2. CLAIMS)

LITASCO EXXONVOY 2005 CLAUSES DTD 30TH MAY '06 AS FOLL:
------------------------------------------------------------
CLS 1 DEL
CLS 2 PARA A AT END ADD 'PROVIDED SUCH DOCUMENTATION IS MADE
        AVAILIBLE TO OWNERS' AND 'OR CHARGES OR EXPENSES
        WITHIN 180 DAYS'
        PARA B AT END ADD 'PROVIDED SUCH DOCUMENTATION IS
        MADE AVAILIBLE TO OWNERS'
CL 4 INSERT AT END 'MAX 5 DAYS AWAITING FOR ORDERS'
CLS 5 LINE 53 DELETE 'INDIRECT'
CLS 5 LINE 55 AFTER 'INSTRUCTIONS' INSERT
        'PROVIDED SUCH INSTRUCTIONS IN ACCORDANCE WITH
        OCIMF AND ANY OTHER REGULATION AND ALWAYS AT
        MASTERS DESCRETION.
CLS 5 LINE 59 AT END ADD 'PROVIDED MINIMUM QUANTITY SUPPLIED'
CLS 5 LINE 65 ADD AT END 'ANY TIME LOST TO COUNT AS LAYTIME OR
        DEMURRAGE IF VESSEL ON DEMURRAGE'
CLS 6 DEL
CLS 7 DEL
CLS 8 DEL
CLS 9 DEL
CLS 11 DEL
```

CLS 12 DEL
CLS 13 DELETE AND INSERT WORDING AS PER PREVIOUS CP'S
    WITH LITASCO ASF: NOTWITHSTANDING ANYTHING TO THE
    CONTRARY ELSEWHERE HEREIN CONTAINED IF THE VESSEL
    COMMENCES THE BALLAST VOYAGE (AS PER ITINERARY ADVISED
    ABOVE) IN TIME TO ARRIVE AT THE LOADPORT WITHIN THE
    CANCELLING DATE BUT IS DELAYED BECAUSE OF THE TRAFFIC
    REGULATIONS OR NAVIGATIONAL DIFFICULTIES (INCL. BAD
    WEATHER, FOG ETC.) THROUGH THE TURKISH STRAITS NORTH-
    BOUND SUCH THAT VESSEL MAY NOT ARRIVE BY THE CANCELLING
    DATE CHARTERERS' OPTION TO CANCEL AS PROVIDED ELSEWHERE
    HEREIN CANNOT BE EXERCISED.
    OWNERS TO NOTIFY CHARTERERS OF THE DATE AND TIME THAT THEY
    EXPECT THE VESSEL TO BE READY TO LOAD BASED ON THE
    ADVISORY POSITION GIVEN BY THE TRAFFIC CONTROL.
    NOTWITHSTANDING ANYTHING TO THE CONTRARY ELSEWHERE HEREIN
    CONTAINED, IF THE VESSEL SHOULD BE DELAYED DURING TANKER
    PASSAGE OR OTHERWISE AS A CONSEQUENCE OF DIRECT OR
    INDIRECT ACTION OF THE TURKISH AUTHORITIES AND/OR
    OBSERVING TRAFFIC REGULATIONS AND/OR NAVIGATIONAL
    DIFFICULTIES (INCL. BAD WEATHER AND/OR ADVERSE CLIMATE
    CONDITIONS) THROUGH THE TURKISH STRAITS IN BALLAST AND
    LADEN CONDITIONS, NORTH AND SOUTH BOUND IN EXCESS OF 48
    HRS IN TOTAL, THE CHARTERERS SHALL PAY COMPENSATION FOR
    SUCH DELAY AT THE RATE OF USD 17000 PD/PR.
    ANY ADDITIONAL EXPENSES IN CONNECTION WITH COMPLYING WITH
    TRAFFIC REGULATIONS AND/OR CHARTERERS' VOYAGE ORDERS AS
    REGARDS THE PASSAGE OF THE TURKISH STRAITS TO BE FOR
    CHARTERERS' ACCOUNT (INCLUDING BUT NOT LIMITED TO
    ADDITIONAL TUGS, PILOTS, ADDITIONAL BUNKERS CONSUMED,
    WAITING OR ADRIFT ETC.)
    COMPENSATION FOR SUCH DELAY, REIMBURSEMENT FOR COST OF
    BUNKERS AND ADDITIONAL EXPENSES TO BE PAID TOGETHER WITH
    FREIGHT AGAINST MASTERS STATEMENT WITH SUPPORTING
    DOCUMENTS TO FOLLOW IN DUE COURSE. OWNERS TO NOMINATE MSSRS
    PALMALI IST AS AGENTS AT TURKISH STRAITS PROVIDED COMPETATIVE.
CLS 17 DEL
CLS 18 LINE 256 AFTER 'PARTY' INSERT 'LOI AS PER OWNERS P AND I
    CLUB WORDING'
CLS 19 DEL
CLS 20 DELETE
CLS 21 LINE 354 AFTER 'TENDERING NOR' INSERT 'OR WHEN STARTING
    LOAD STS EQUIPMENT'
CLS 21 LINE 356 AT END OF SENTENCE INSERT 'OR WHEN WHEN FINISHED
    OFF LOADING STS EQUIPMENT'
CLS 24 INSERT AT END 'HOWEVER LITASCO ALWAYS TO GUARANTEE THE
    PERFORMANCE OF THE CHARTER'
CLS 28 AGREED BUT IT IS UNSTOOD THAT OWNERS P AND I CLUB WORDING
    REPLACES THE WORDING IN THIS CLAUSE (IT MEANS THAT CHARTS
    WILL ONLY INVOKE THE CLAUSE).
CLS 29 OK WHEN APPLICABLE
CLS 30 DELETE

OTHER CLAUSES
--------------
-OWNERS OPTION TO SUBSTITUTE SIMILAR SISTERSHIP,ALWAYS SUBJECT
 TO CHARTERERS APPROVAL,WHICH NOT TO BE UNREASONABLY WITHHELD.
-OWNERS WEATHER CLS
 IF DISCH FALCONARA, FIUMICINO, RAVENNA, GAETA, LA NOUVELLE, GULF
OF ISKENDERUN, PRIOLO,
 MOROCCO, PORTUGAL, SPANISH ATLANTIC, AND / OR IF LIGHTERING /
LIGHTENING/ TRANSHIPMENT
 TAKES PLACE AT ANY LOCATION AND / OR IF LOADING / DISCHARGING VIA
A SEALINE / SEABERTH /
 SEATERMINAL, ANY DELAYS DUE TO BAD WEATHER / SEA STATE CONDITIONS
INCL FOG AND SWELL
 TO COUNT AS LAYTIME OR DEMURRAGE IF ON DEMURRAGE AND ANY
UNBERTHING / REBERTHING
 EXPENSES TO BE FOR CHARTERERS ACCOUNT AND SETTLED BY THEM
 DIRECTLY. CONOCO WEATHER CLAUSE TO APPLY FOR ALL OTHER PORTS /
PLACES.
-ANY TAXES AND/OR DUES ON CARGO AND/OR FREIGHT TO BE FOR CHARTERERS
ACCOUNT AND SETTLED
 BY THEM DIRECTLY.
-ANY ADDITIONAL WAR RISK PREMIUM ON H+M VALUE SHALL BE FOR
CHARTERERS ACCOUNT. ADDITIONAL
 PREMIUM,IF ANY, TO BE COMPETITIVE AND FULLY DOCUMENTED.
-IF BERTH IS FREE AND CARGO AVAILABLE CHARTERERS TO DO THEIR BEST
ENDEAVOURS TO LOAD
 VESSEL EARLIER IF POSSIBLE.
-DISCHARGE PORTS ALWAYS TO BE IN GEOGRAPHICAL ROTATION.
-IF APPLICABLE, FLAT RATE TO BE CALCULATED WEST OF SICILY LADEN
AND MESSINA BALLAST

END CLEAN RECAP
PLS CONFIRM THAT ALL ABOVE ARE IN LINE WITH NEGOS


BEST REGARDS
IGOR V RASPOPOV

Palmali Shipping GR
44, Hatzikiriakou Str.,
18538 Piraeus,
GREECE
TEL    : +30 210 4290413/4/5
FAX    : +30 210 4291283
E-MAIL : CHARTERING@PALMALI.GR
         IRASPOPOV@PALMALI.GR
YAHOO  : IGOR_RASPOPOV
===============================================

This information contained in this e-mail is confidential and intended only for
the use of individual or entity named as the addressee. If you are not the
intended recipient, you are hereby informed that any disclosure, copying,
distribution or taking any action in reliance on the contents of this e-mail is
strictly prohibited. Please delete it from your PC and inform us.

Enquiries to this e-mail should be addressed to palmali@palmali.gr

## Operation1

**From:** Operation1
**Sent:** Παρασκευή, 8 Δεκεμβρίου 2006 5:10 μμ
**To** milko@tifanco.com
**Subject:** mt NAPA VOY NO. 3 TCP AL-DAWEED SHIPPING LINES LTD DD 25/10/2006

msg 6356 GS/av   08/12/2006

TO: TIFANCO
Attn. Mr Milko

**URGENT !!!! URGENT!!!!!!  URGENT!!!!!**

### SEVEN  (7) DAYS NOTICE

Further to our previous message kindly note that Owners have not received the funds covering first hire payment and cost of bunkers on board at the time of delivery U.S.D. 557,870.00 as per attached hire invoice

Regretfully and pursuant to the relative clause of the tcp, owners are herewith formally placing charterers on notice that they are in default and owners will withdraw the vessel pursuant to the relative tcp clause

Owners reserve all right under the charter party and will hold charterers fully responsible for all consequences of charterers' failure to comply with their obligations under the tcp.

B Regards
EUROTANKERS INC
Capt. G.Sinanis

**OUR NEW EMAIL ADDRESSES :**

- **General**
- **Operation Department**
- **Marine Department**
- **Technical Department**
- **Purchasing Department**
- **Accounting Department**
- **Crewing Department**

**eurotankers@eurotankers.gr**
**operation@eurotankers.gr**
**marine@eurotankers.gr**
**technical@eurotankers.gr**
**purchasing@eurotankers.gr**
**accounting@eurotankers.gr**
**crew@eurotankers.gr**



EXHIBIT

B

tabbies

# EUROTANKERS INC.

## SHIPPING AGENCY

99 Akti Miaouli
185 38 Piraeus – Greece
V.A.T EL 098066070

Tel.: +30 210 4292550
Fax: +30 210 4292554
Tlx : 211401 EURT
E-mail: eurotankers@eurotankers.gr

Piraeus, 15th, December 2006

Messrs
**AL-DAWOOD SHIPPING LINES LTD**
41/43 Bombay Crescent, Apapa,
Lagos – Nigeria
c/o **TIFANCO**
13-15 Homefield Road
Wembley Middlesex
HAO 2NL – flat 4

### NOTICE OF WITHDRAWAL

### m.t. NAPA – tc/p AL DAWOOD SHIPPING LINES LTD dd 25.10.2006

Following our message of 8th, December 2006 and the failure by Charterers to pay the outstanding hire within five (5) banking days, we hereby give notice that the m/t NAPA has now **BEEN WITHDRAWN** from the service of Charterers in accordance with Clause 8 par. 8.4, of the Charterparty dated 25.10.2006.

This notice takes effect immediately and is given without prejudice to all rights and hold Charterers fully liable for all the losses and damages arisen.

SIGNED :

For and on behalf of
**EUROTANKERS INC.**
Capt. Ellas Cousis

ISM Code
Safety
Management
System
Certified



EXHIBIT